UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

In re HAROLD BUNTING,

                Debtor.

SANDWEISS LAW CENTER, P.C.,

                Appellant,

                                             Case Number 12-10472
v.                                            Honorable Thomas L. Ludington

VIRGINIA KOZLOWSKI,

                Appellee,

RANDALL L. FRANK,

                Interested Party.

_____/

**OPINION AND ORDER AFFIRMING BANKRUPTCY COURT**

This "suit has, in course of time," seen "a long procession of judges come in and gone out," yet still the case "drags its weary length before the Court." *Stern v. Marshall*, 131 S. Ct. 2594, 2600 (2011) (Roberts, C.J.) (brackets and ellipsis omitted) (quoting Charles Dickens, *Bleak House*, *in* 1 *Works of Charles Dickens* 4–5 (1891)). Although neither Chief Justice Roberts nor Mr. Dickens was referring to this case, they could have been.

About twelve years ago, Virginia Kozlowski (at the time, Mrs. Bunting) sought a divorce from her husband, Charles Bunting, in Michigan state court. Trial on division of the marital estate began in 2002. Mr. Bunting has been challenging the division ever since. He took five appeals to Michigan's court of appeals. And, when it seemed that he had exhausted his litigation resources, he found a willing proxy to continue the fight — his lawyer Stuart Sandweiss.

That gentleman, who held a judgment against Mr. Bunting for unpaid attorney fees, initiated an involuntary Chapter 7 bankruptcy proceeding against Mr. Bunting.  From the outset of the bankruptcy litigation, however, Mr. Sandweiss acknowledged that he was "going to put the interest of my client [the Debtor] ahead of the interest of my law firm."  And Mr. Bunting's principal interest was reducing the amount awarded to Ms. Kozlowski pursuant to the judgment of divorce.  In furtherance of that interest, Mr. Sandweiss filed a number of objections to Ms. Kozlowski's claim.  The bankruptcy court overruled the objections.  Mr. Sandweiss appeals.[1]  For the following reasons, the judgment of the bankruptcy court is affirmed.

# I

## A

Mr. Bunting (Debtor) and Ms. Kozlowski (Appellee) married in 1971.  Appellant's Br. 4.  Both were about forty.  *Id.*  Both had been previously married.  *Id.*  The Debtor owned an industrial supply company, Metro Bolt and Fastener, where Appellee had worked for about 20 years.  *Id.*

Over the next 29 years, the couple achieved considerable financial success.[2]  Their real property holdings, for example, grew to include: two condominiums in St. Lucie, Florida (the Princess and Islandia condominiums); a condominium in Ann Arbor, Michigan (the Burbank condominium); a parcel of land in Ypsilanti, Michigan (the marital residence);  a parcel in Dearborn Heights, Michigan (the 8639 Columbia property); a parcel in Macomb County,

---

[1] More precisely, Mr. Sandweiss is a sole practitioner.  His firm, Sandweiss Law Center, P.C., is the Appellant in this case.  For ease of reading, "Appellant" is given the male singular pronoun "he" throughout rather than the gender neutral "it."

[2] Appellant contends that the marital estate was valued at about $13 million at the time the judgment of divorce was entered in 2002.  Appellant's Br. 4.  Appellee, while acknowledging that the couple "accrued significant assets," asserts that the $13 million valuation is overstated and "is not based on any documentary evidence that has ever been produced in this or any other proceeding."  Appellee Br. 9.

Michigan (the Hall Road property); two parcels in Washtenaw County, Michigan (the Berry Road and Prospect Road properties); two parcels in Ogemaw County, Michigan (the Townline Lake and Kelly Lake properties); a parcel in Lapeer County, Michigan (the Metamora property); a parcel in St. Lucie, Florida (the Indian River property); a parcel in Cape Coral, Florida; a parcel in Citrus Springs, Florida; a parcel in Poinciana, Florida; and a parcel in San Salvador, Bahamas. *See* Consent Judgment of Divorce 4–15, ECF No. 3-3, at 37–48.

In July 2000, the Debtor decided to divide the couple's Merrill Lynch accounts between Appellee and himself. Bankr. Op. 2, Sept. 28, 2010, Bankr. ECF No. 926 ("Bankr. 2010 Op."). At the time, the accounts contained about $3 million.

In December 2000, Appellee filed for divorce in Washtenaw County Circuit Court. Appellant's Br. 4. The proceedings have proved contentious ever since.[3]

## 1

The divorce case was assigned to Judge Timothy Connors. Initially, Gregory Rohl represented the Debtor. Appellant's Br. 5. (Appellant began representing the Debtor in 2004. *See* Bankr. Mot. Hr'g Tr. 176, Nov. 8, 2007, ECF No. 4-2, at 399.) Denise Fawcett represented Appellee. Appellant's Br. 4.

Trial on the division of the marital estate began on February 28, 2002. *Id*. at 5. Soon after the trial began, however, the parties agreed to settle. *See id*. On the third day of trial, an oral agreement was placed on the record, with the parties agreeing to return the following week to enter a consent judgment of divorce. *Id*. But the day before the scheduled entry of the consent judgment, counsel for the Debtor requested an adjournment of the hearing due to a

---

[3] As detailed below, the present bankruptcy appeal is in large measure a continuation of the divorce proceedings begun about 12 years ago.

scheduling conflict.  *Id*.  The request was denied.  *Id*.  The following day, the circuit court entered a copy of the consent judgment tendered by Appellee's counsel.  *Id*.

The consent judgment awarded Appellee the marital home, the Hall Road property, the princess condominium, the Berry Road property, the Prospect Road property, the Metamora property, and the Indian River property.  Consent Judgment of Divorce 4–8, ECF No. 3-3, at 37–48.  It awarded the Debtor the Town Lake property, the Kelly Lake property, the Burbank condominium, and the Islandia condominium.  *Id*. at 8–12.

The consent judgment also granted Appellee a variety of liens against the property awarded to Debtor, but did not grant the Debtor a security interest in any of the properties awarded to Appellee.  First, it granted Appellee a security interest in each of the four specific real properties awarded to the Debtor.  *Compare id*. at 4–8 (granting Appellee security interests in Town Lake, Kelly Lake, Burbank, and Islandia properties), *with id*. at 8–12 (not granting Debtor security interests in Appellee's properties).  The judgment also granted Appellee a blanket security interest over every asset awarded to the Debtor pursuant to the judgment, providing: "Plaintiff Virginia Bunting is granted a security interest in the assets awarded to Defendant Harold Bunting until all financial obligations by Defendant as provided by this Consent Judgment are fully met."  *Id*. at 25.  (This blanket security obligation, the Michigan Court of Appeals would later determine, was not part of the parties' oral agreement.)

Additionally, the consent judgment restricted the Debtor's ability to encumber or transfer the Kelly Lake and Townline Lake properties until he had met all his obligations under the consent judgment.  *Id*. at 9–10.  Preventing the Debtor from encumbering the properties, the judgment provided: "Defendant may not encumber either property until his obligations to Plaintiff pursuant to this Consent Judgment are fully satisfied."  *Id*. at 10.  And restricting the

Debtor's ability to encumber the property, the judgment continued: "Defendant shall deliver to Plaintiff, through counsel, a quit claim deed, drafted by Defendant's counsel, to the Kelly Lake and Townline properties awarding all right, title and interest in the property to the Defendant pursuant to this Consent Judgment.  Plaintiff shall execute said deeds in favor of Defendant after all other terms and provisions of this Consent Judgment are satisfied."  *Id*. at 9.

And finally, the consent judgment provided that a special master would determine an "equalizer," an amount that one party would be directed to pay to the other to equalize the marital estate.  Appellant's Br. 7; *see also* Consent Judgment of Divorce 23.

Appellee promptly recorded notices of the liens in the land records of the various counties where the real properties were situated.

**2**

In March 2002, Caterina Fox, previously appointed as a bookkeeper in the case, was appointed special master.  Appellant's Br. 7.

In December 2002, the circuit court adopted the special master's recommendation regarding the equalizer and entered a money judgment of about $600 thousand in favor of Appellee against the Debtor.  *See id*.; Post-Judgment Order 1–4, ECF No. 2-1, at 64–67.  Specifically, the court concluded that the Debtor owed Appellee an equalizer of $401,974.68, plus a "*Sands* award"[4] of $187,830.16 for trying to conceal certain life insurance policies issued by Jackson National.  Post-Judgment Order 2–3.

---

[4] In *Sands v. Sands*, 497 N.W.2d 493 (Mich. 1993), the Michigan Supreme Court held that "the circuit court must make an equitable division on the basis of the facts proven in each individual case.  A party's attempt to conceal assets is a relevant consideration."  *Id*. at 496.

**3**

The Debtor, "both in pro per [and] through counsel," then filed several motions to vacate the consent judgment of divorce and post-judgment order.  Appellee's Br. 6.  The circuit court denied the motions.  *Id*. at 8.

The Debtor took an appeal of right to the Michigan Court of Appeals.  *Bunting v. Bunting* (*Bunting I*), No. 246087, 2004 WL 1672425 (Mich. Ct. App. July 27, 2004) (per curiam).  This appeal, the first of five the Debtor took to the Michigan Court of Appeals regarding the divorce proceedings, is referred to by the parties as "*Bunting I*."

**4**

While *Bunting I* was pending, the Debtor filed a Chapter 11 petition in the United States Bankruptcy Court for the Eastern District of Michigan (Case No. 03-22751).  In the Debtor's bankruptcy schedules, he calculated his total assets as $450,319 plus an "unknown" amount in real property.  ECF No. 3-2, at 31; *see generally id.* 31–96 (schedules).  He calculated his total liabilities as $1,057,433.70 — $57,433.70 in secured and unsecured claims to various creditors, plus a $1 million secured claim to Appellant that, the Debtor dryly observed, arose "allegedly through a divorce proceeding."  ECF No. 3-2, at 31, 43.

**5**

In July 2004, the Michigan Court of Appeals decided *Bunting I*, affirming in part, reversing in part, and remanding the case to the state circuit court.  2004 WL 1672425, at *6.  First, the court affirmed the post-judgment order's equalizer.  *Id.* at 1.  Next, it also affirmed the *Sands* award, explaining:

> [T]he parties had been married for approximately thirty years, and plaintiff actively contributed to the increase in the marital estate.  Both parties were retired and financially well off, not in good health, and were in their late 60s or early 70s. With respect to past relations and conduct of the parties, defendant's behavior left

much to be desired.  He violated the restraining order on numerous occasions by removing money from accounts.  Defendant sent plaintiff a threatening audiotape and impaled items on her fence.  He falsely reported to police that the person hired to appraise the vehicles had stolen them.  He refused to sign listing agreements, even when ordered to sign them by the court.  He transferred the Merrill Lynch accounts to Jackson National, then refused to disclose their whereabouts.  When the policies were discovered, defendant refused to comply with the court's order to sign a release so that plaintiff could determine their value.  He encouraged land contract vendees to delay payments, then denied doing so.  He filed motions without counsel's knowledge and refused to let his attorney sign any documents.  Given that this evidence was presented to the trial court, the court's determination that the Jackson National life insurance policies were forfeited was not an abuse of discretion.

*Id*. at 6.  Turning to the consent judgment of divorce, the court reversed in part — including the imposition of the blanket lien in all property awarded to Debtor and the restriction on his ability to transfer or encumber the Kelly Lake and Townline Lake properties — explaining in pertinent part:

> In comparing the consent judgment with the settlement agreement on the record, we find that the consent judgment did not comport with the agreement on record with respect to the following items: the consent judgment improperly restricted defendant's ability to transfer or encumber the Kelly Lake and Townline Lake properties, improperly gave plaintiff a lien in all property awarded defendant, and permitted plaintiff to convey defendant's interest after all terms of the consent judgment had been satisfied while requiring defendant to immediately convey plaintiff's interest.  There was clearly disagreement with respect to the lien provisions, and plaintiff should not have been permitted to unilaterally add the lien provisions to the consent judgment.

*Id*. at 3.  And, as noted, the court remanded the case "for proceedings consistent with this opinion."  *Id*. at 6.

**6**

Filing for bankruptcy protection, however, had imposed an automatic stay on the state court proceedings.  *See* 11 U.S.C. § 362.

Returning to the bankruptcy court, the parties agreed to lift the stay to enforce the decision in *Bunting I*.  *See* Stipulated Order Lifting Stay 1, ECF No. 4-3, at 104–05; *see also*

Appellant's Br. 9.  On November 9, 2004, a stipulated order was entered lifting the automatic stay "to allow the Washtenaw County Circuit Court to modify the Judgment of Divorce pursuant to the terms of the Court of Appeals decision."  *Id.*

The order further provided that the stay was lifted "for the parties to take further appeals, if necessary, from the Washtenaw County Circuit Court order modifying the terms of the Judgment of Divorce."  Stipulated Order Lifting Stay 1–2.

This latter provision would prove necessary.

**7**

On January 21, 2005, the state circuit court entered an "order conforming consent judgment of divorce to court of appeals opinion."  Conforming Order 1, ECF No. 2-1, at 56.  In pertinent part, the conforming order provided:

> IT IS FURTHER ORDERED AND ADJUDGED that the provisions in the March 14, 2002, Consent Judgment of Divorce establishing liens in favor of the Plaintiff in all property of the Defendant are hereby vacated and shall have no force and effect.
>
> IT IS FURTHER ORDERED AND ADJUDGED that Plaintiff's interest in the property awarded to Defendant shall be secured by liens in each of the properties listed below, which properties were awarded to Defendant in the Consent Judgment of Divorce; these liens shall remain in effect until such time as Defendant has satisfied his obligations to Plaintiff pursuant to the Consent Judgment of Divorce, as modified by this order and/or other post-judgment orders of this Court.  Pursuant to this order, Plaintiff retains liens in the following properties:
>
> > A.     Kelly Lake property;
> > B.     Townline Lake property;
> > C.     3505 Burbank, Ann Arbor, Michigan;
> > D.     8639 Columbia, Dearborn Heights, Michigan;
> > E.     Cash value or proceeds of Defendant's Equitable Life Insurance Policy.

Conforming Order 2, ECF No. 2-1, at 57.

The Debtor, again disagreeing with the circuit court's decision, once again appealed to the Michigan Court of Appeals. *Kozlowski v. Bunting* (*Bunting II*), No. 260869, 2006 WL 3826749 (Mich. Ct. App. Dec. 28, 2006) (per curiam). This appeal is referred to by the parties as "*Bunting II*."

**8**

While the appeal in *Bunting II* was pending, the Debtor moved to dismiss his Chapter 11 petition. Appellant's Br. 10. On March 3, 2006, the bankruptcy case was dismissed. *Id.*

The following month, Appellee petitioned the state circuit court for a receiver to take control of the Debtor's property and for a decision on the amount due pursuant to the consent judgment. *Id.*

Granting the petition, the circuit court appointed Thomas Moors as receiver. *Id.* By a separate order issued July 19, 2006, the court found that under the terms of the consent judgment the parties agreed that Debtor owed Appellee almost $1 million. Order Regarding Sums Due Under Judgment of Divorce 2, ECF No. 3-2, at 169. Specifically, the order provided: "On April 14, 2003 the parties submitted a written, detailed stipulation establishing the amount due as of that date: $956,802.83. The parties are bound by that stipulation." *Id.*

The order went on to note that the Debtor claimed that he was entitled to a credit of $139,358.19, and so provided: "The receiver may take whatever action is necessary to satisfy collection of $956,802.83. The first $817,444.64 collected shall be paid immediately to Plaintiff and her counsel. The remaining $139,358.19 shall be placed in escrow until such time as this Court makes a decision on Defendant's allegations that he is owed credit for that sum." *Id.*

The Debtor, once more disagreeing with the circuit court's decision, again appealed to the Michigan Court of Appeals. *Bunting v. Bunting* (*Bunting III*), No. 272975, 2008 WL

2037774 (Mich. Ct. App. May 13, 2008) (per curiam).  This appeal, filed on September 8, 2006, is referred to by the parties as "*Bunting III*."

**9**

In November 2006, the circuit court held the Debtor in contempt of court for refusing the court's order to convey his interest in the Cape Coral property to Appellee.  Appellant's Br. 14; *see* ECF No. 4-1, at 305–06 (order).   "If the Receiver in this matter, Thomas O. Moors, determines that Defendant Edwin Harold Bunting has failed to cooperate scrupulously with the transfer of the property," the order further cautioned, "Defendant shall be assessed costs in the amount of $10,000 per week commencing on November 16, 2006."  Id. at 2.

The Debtor once again disagreed with the circuit court's decision.  Instead of cooperating with the transfer of the property (scrupulously or otherwise), he again appealed to the Michigan Court of Appeals.  Appellant's Br. 15; *Bunting v. Bunting* (*Bunting IV*), No. 274707 (Mich. Ct. App. Feb. 14, 2008) (unpublished op.) (dismissing case for lack of jurisdiction).  This appeal is referred to by the parties as "*Bunting IV*."

**10**

In December 2006, the Michigan Court of Appeals decided *Bunting II*, affirming the circuit court's conforming order.  *Bunting II*, 2006 WL 3826749, at *6.  Rejecting the Debtor's argument that "that *Bunting [I]* held that Kozlowski is not entitled to liens on any of [the Debtor's] properties," the court explained "*Bunting [I]* did not preclude all liens or future liens, only those unilaterally added to the consent judgment." *Id*. at 2.  The court further held that the circuit court "correctly modified the consent judgment to conform to *Bunting [I]*, including exercising its equitable powers to impose liens," *id*. at 3, elaborating:

> A divorce case is equitable in nature, and a court of equity molds its relief according to the character of the case; once a court of equity acquires jurisdiction,

-10-

it will do what is necessary to accord complete equity and to conclude the controversy. . . .

The record demonstrates that Bunting: willfully allowed a Rolls Royce to lose value by leaving it exposed to the elements; failed to timely submit documents and records in the bankruptcy proceedings; repeatedly failed to accurately and fully disclose income and assets; and repeatedly retained new counsel as a delaying tactic. The trial court properly exercised its inherent authority to enforce its own directives to "accord complete equity" given Bunting's behavior and demonstrated hostility toward Kozlowski. The trial court's exercise of its equitable powers did not contravene this Court's directive in *Bunting [I]*, which did not address whether liens could be imposed based on the equitable considerations described above. We hold, on the particular facts before us, that the law of the case doctrine does not preclude the trial court's provision of liens on properties owned by Bunting because the trial court applied equitable principles in awarding Kozlowski liens given Bunting's demonstrated noncompliance with the trial court's orders.

*Id.* at 2 (quotation marks omitted) (quoting *Walworth v. Wimmer*, 504 N.W.2d 708, 708 (Mich. Ct. App. 1993)).

In February 2007, the Michigan Court of Appeals dismissed *Bunting IV* for lack of jurisdiction (*Bunting III* remained pending — it would not be decided until May 2008).

**11**

About this time, Appellant filed suit against the Debtor in the United States District Court for the Eastern District of Michigan, Southern Division. *See* Complaint, *Sandweiss Law Ctr. v. Bunting*, No. 07-10099 (E.D. Mich. Jan. 4, 2007). The complaint alleged that Appellant was retained by the Debtor in November 2004 to represent him "in a civil action in Washtenaw County, Michigan and in subsequent appeals to the Michigan Court of Appeals." *Id.* ¶ 7. The complaint further alleged that the parties agreed that the Debtor would pay Appellant "at the rate of $175/hour, plus costs." *Id.* ¶ 8. Alleging that Appellant had not been paid for his work, aside from a $7,000 retainer, the complaint sought $144,659.25 in unpaid attorney fees and costs, plus

interest.  (Excluding costs, at the rate of $175/hour the amount demanded in the complaint represents billing 826.6 hours of work.)

On February 28, 2007, the federal district court granted default judgment in favor of Appellant against Debtor.  In March 2007, notices of judgment liens against the Debtor were recorded in four Michigan counties (specifically, Ogcmaw, Wayne, Washtenaw, and Iosco counties).

On Wednesday, April 4, 2007, the state circuit court issued a show cause order that directed to Appellant to show cause why he should not be held in contempt of court for violating the court's orders by recording the liens.  *See* ECF No. 2-3, at 45–46.  Specifically, the order directed Appellant to appear on Friday, April 6, 2007 to show cause why he should not be held in contempt for the court's prohibition against Appellant recording judgment liens against the Debtor's property.  *Id.*

**B**

On Thursday, April 5, 2007, Appellant filed an involuntary Chapter 7 petition against the Debtor in the United States Bankruptcy Court for the Eastern District of Michigan (Case No. 07-20864).  (As discussed below, Appellant would later explain that he did so "as an emergency because of the show cause order that was imposed on by Judge Connors."  Hr'g Tr. 43, Apr. 19, 2007, *attached as* ECF No. 3-1, at 44.  That is, Appellant sought the protection of the bankruptcy court's automatic stay after receiving a voicemail from opposing counsel notifying him "I just want you to know we've issued a show cause order against you.  You've got to appear Friday morning and bring your toothbrush with you."  *Id.*)

**1**

On April 10, 2007, Appellee filed a motion in the bankruptcy court for relief from the automatic stay.  *See* Motion for Order Lifting Automatic Stay, *In re Bunting*, No. 07-20864 (Bankr. E.D. Mich. Apr. 10, 2007), ECF No. 4.  Noting that the state circuit court had ordered the receiver to liquidate the assets of the Debtor to pay the divorce judgment award, Appellee further noted that sales of the Kelly Lake and Townline Lake were "scheduled to close shortly." *Id*. ¶¶ 5–6.  Appellee concluded: "If these sales are not closed, it is possible that the purchasers will withdraw their purchase offers to the detriment of Kozlowski and all creditors."  *Id*. ¶ 8.

Appellant filed a response brief expressing both his and the Debtor's partial opposition to Appellee's motion.  Response Brief, *In re Bunting*, No. 07-20864 (Bankr. E.D. Mich. Apr. 17, 2007), ECF No. 9.  Specifically, Appellant wrote that both he and the Debtor agreed to the sale of the Kelly Lake property, but opposed the sale of the Townlake property.   Appellant elaborated:

> In order to facilitate resolution of the longstanding dispute with Kozlowski, Bunting [has] agreed to stipulate to the sale of the Kelly Lake Road property for $476,000 — provided that the proceeds are used to pay the liquidated judgment owing to Kozlowski that is currently on appeal  in the Michigan Court of Appeals [i.e., *Bunting III*].   For the sake of Bunting, [Appellant] will join in that stipulation, even though, under the priority rules, [Appellant] is at least equal to, or arguably has a higher priority than, Kozlowski.
>
> Notwithstanding, both Bunting and [Appellant] object to lifting the stay to sell the Townline property as the proposed sale amount ($505,000) is far below market value.  Furthermore, it is unfair to Debtor to sell this property (which has been in his family for over 35 years) to satisfy Kozlowski's unliquidated, unsecured claim for attorney fees, especially while there is an appeal that remains pending in the Michigan Court of Appeals and ultimately it is likely that the [circuit court] July 19, 2006 Order will be reversed.

*Id*. at 3–4 (footnote and emphasis omitted).  On April 19, 2007, Bankruptcy Judge Daniel Opperman held a hearing on Appellee's motion to lift the stay.  *See* ECF No. 3-1, at 3–99

(hearing transcript).  At the hearing, Appellant elaborated on his unusual position as the Debtor's

creditor, counsel for the Debtor, and counsel for himself as creditor, explaining:

> One of the — one of the issues that was raised at the end of [the argument of
> counsel for Appellee] was the fact that there may be a conflict because I'm here
> representing a creditor.  I think quite frankly I'm the second largest —
> representing the second largest creditor behind Ms. Kozlowki.
>
> And she says well, we — I should agree with selling Townline because there's
> more cash to pay.  And in a normal world that's probably the case.
>
> But, and I think it's an important but, I think in fairness to Mr. Bunting, I don't
> want to do that.  I don't think it's — I can't — I could not look in the mirror to
> say I've taken a property away from an individual who has had this property in
> his family for 30, 40 years to satisfy a judgment when there are plenty of other
> resources available to get the same result, to get the same money.

Hr'g Tr. 28, Apr. 19, 2007, *attached as* ECF No. 3-1, at 29.  Asked by the bankruptcy court why

Appellant wouldn't want the stay lifted to get the payment for the Townline property, Appellant

responded:

> Oh, absolutely.  But we haven't even — I mean this case is such in its infancy, I
> haven't had a chance to address that yet.  Because that would be — that would be
> an issue from Mr. Bunting and I'm not clear as to who's representing Mr. Bunting
> in this proceeding if I'm going to — if I'm going to be able to do that or if
> because I'm a creditor there's a conflict.
>
> I haven't been able — this was filed as an emergency because of the show cause
> order that was imposed on by Judge Connors to say well, you've got to — you've
> got to lift the judgment liens. . . .
>
> Mr. Scloss when that show cause order gets issued, Mr. Schloss leaves me a voice
> mail, ["]by the way we issued a show cause, I just want you to know we issued a
> show cause order against you.  You've got to appear Friday morning and bring
> your toothbrush with you.
>
> And I can play it for the Court if you want.  But to come up with — you know,
> it's become — this has not become — I say this because it's not become business
> anymore when I get a comment like that all of a sudden it's personal . . . .

Hr'g Tr. 42–43, *attached as* ECF No. 3-1, at 44–45.  Asked whose interests he was representing,

Appellant responded:

I'm trying to — I'm trying to play a fine line here. I don't want to — I don't want to prejudice Mr. Bunting as his State Court counsel and that's why I said, all right, I'm going to put the interest of my client ahead of the interest of my law firm.

But if anything, you know, I — I think that's — that's — I don't think anybody can have a complaint to me about doing that except my wife and my children. But certainly, you know, legally I don't think anybody can come to me and say well, you're not representing Mr. Bunting properly, you've got a conflict, you're not putting your client's interest — and I've talked to the State Bar about this issue and I've talked to Mr. Bunting about this issue.

And I told him that I didn't — wouldn't [agree to sell the Townline Lake property] because it's not right and quite frankly it's not right from a moral — moral perspective and I live my life in such a way that I'm not — I refuse to do anything that's going to violate my principles and I don't think that, you know, I don't think that selling Townline Lake, even though I've been asked to do it, would be the right thing to do morally and I don't want to do that.

Hr'g Tr. 49–50, *attached as* ECF No. 3-1, at 51–52.

On April 27, 2007, the bankruptcy court entered an order granting in part and denying in part the motion to lift the stay. Order Lifting Stay, *In re Bunting*, No. 07-20864 (Bankr. E.D. Mich. Apr. 27, 2007), ECF No. 21. Specifically, the order granted the request to lift the stay to allow the uncontested sale of the Kelly Lake property. *Id.* ¶ A. But the order denied the request to lift the stay to sell the Townlake property. *Id.* Additionally, the order provided that the stay was lifted with respect to the pending circuit court action "the purpose of allowing the Washtenaw County Circuit Court to determine the amount of the claim of Virginia Kozlowski." *Id.* ¶ C. And the order provided that the stay was lifted with respect to all appeals from orders of the circuit court to the Michigan Court of Appeals. *Id.* ¶ D.

**2**

On April 30, 2007, the circuit court entered an order determining the amount Appellee was entitled to pursuant to the judgment of divorce and post-judgment orders. *See* ECF No. 3-2, at 171–72 (order). The court concluded that the amount due pursuant to the judgment of divorce

was $1,189,944.69.  *Id*.  Additionally, the court ordered various sanctions, including $180,000 for not complying with the court's orders regarding the Cape Coral property.  *Id*.

The Debtor moved for reconsideration.  Appellant's Br. 15.  The motion was denied, and so the Debtor once again filed an appeal with the Michigan Court of Appeals challenging the Cape Coral sanction.  *Id*.; *see Bunting v. Bunting* (*Bunting V*), No. 278472 (Mich. Ct. App. Nov. 15, 2007) (unpublished op.) (dismissing case for lack of jurisdiction).  This appeal is referred to by the parties as "*Bunting V*."

**3**

Appellee filed a motion on May 21, 2007 in the bankruptcy court to appoint an interim trustee.  Appellant's Br. 21.  The court granted the motion.  *Id*.

On July 27, 2007, an order granting relief against the Debtor was entered.  *Id*. at 20; *see* Order for Relief in An Involuntary Case, *In re Bunting*, No. 07-20864 (Bankr. E.D. Mich. July 27, 2007), ECF No. 136.

The trustee filed bankruptcy schedules on August 16, 2007.  *See* Schedules A–J, *In re Bunting*, No. 07-20864 (Bankr. E.D. Mich. Aug. 16, 2007), ECF No. 163.  (These schedules were stricken a short time later.  Several amended sets of schedules followed.)

**4**

On November 8, 2007, the bankruptcy court held a hearing on several motions, including a motion to convert the Chapter 7 proceeding into a Chapter 11 proceeding.  Providing background on why the Debtor had voluntarily dismissed his previous Chapter 11 filing, Appellant (once again appearing to act not simply as a creditor, or as counsel for a creditor, but also as a de facto attorney for the Debtor) explained:

[T]he previous Chapter 11 case was filed right after Mr. Bunting's divorce. . . . Judge Connors at that point had appointed a receiver.  They were trying to liquidate property.  And there was a lot more property then.

There was a question under — the big question in that case, and there was a lot of time and effort spent arguing over it, was the secured status as to Ms. Kozlowski and whether or not she had a — a secured claim, what her priority status was in terms of getting properties.  And they spent an inordinate amount of time arguing that back and forth.

That issue finally got resolved by the Michigan Court of Appeals on July 27th of 2004 when they ruled that Ms. Kozlowski did not have — that the liens that were the original divorce judgment were to be vacated and that it was supposed to — remanded back to Judge Connors for an order — for an order vacating those liens which was finally entered on January 21st of 2005.

Subsequently Mr. Bunting believed that his counsel then Mr. Bassel was not representing him properly and he hired new counsel, Ms. Gravel-Henkel.  Ms. Gravel-Henkel spent I don't know, six months maybe going through trying to understand the proofs of claims as to what was — you know, who had a proof of claim in that case, chiefly Ms. Kozlowski. . . .

[T]he case was moving until all of a sudden the — the fees that he believed he was owing Ms. Gravel-Henkel got to be — [the Debtor] was frustrated with the lack of progress in terms of that because of all the motions and said wait a minute, this is costing me too much, I'm going to be broke by the time you get done with this Chapter 11.

Hr'g Tr. 58, 60, Nov. 8, 2007, *attached as* ECF No. 4-2, at 281, 283.  Turning to why the pending Chapter 7 proceeding should be converted into Chapter 11 proceeding, Appellant continued:

The fact is that this was the impression that [the Debtor] got why — as to why he dismissed his previous Chapter 11.  And I think that's very important when — when the Court asked, well what happened — what's different in this case?

I think what is different in this case is that number one, we've got established criteria.  One of the things that [I did] when I got back involved in this case, or seriously involved in this case last April,[5] a year and a half ago, there was an issue before Judge Connors at that time as to how much Mr. Bunting was indebted to, if any, to Mrs. — Ms. Kozlowski.

---

[5] Appellant later clarified that "I have been working for Mister — worked for Mr. Bunting since about October/November 2004."  Hr'g Tr. 176, Nov. 8, 2007, *attached as* ECF No. 4-2, at 399.

And we went back and forth on that number and I finally sat down.  Mr. Bunting kept saying to me, he says, and as the Court knows I was representing him in the action, I've got all these credits due me. . . .

And I went and spent a lot of time, hours and hours comparing the different orders from the Washtenaw County Court and there was probably, I don't know, close to 100 of them and saying you're right on this, you're wrong on this, you're right on this.  And finally we formulated it into briefs that went before Judge Connors and Judge Connors ruled against him on some of those issues.  And that's why there was an appeal pending that's commonly known as *Bunting [III]*. . . .

If Mr. Bunting is successful in that appeal, then on the cash we have on hand, that the trustee has on hand from the sale of property and so forth, the case — this case is basically over.  There is enough money to pay all the creditors because Ms. Kozlowski's claim will have been wiped out.  And the only other significant creditors are my law firm, Ms. Gravel-Henkel, and then there's maybe another I don't know, $100,000 in taxes or other — other credits. . . .

What Mr. Bunting has been saying to the Court, well, don't sell my property, don't liquidate me until that becomes final.  And it's not such a bad argument.  I mean it's, you know, it's — it's like putting the cart before the horse.

What Mr. Bunting is also saying is hey, I tried to run a business over here. . . .

What makes sense if everybody [sincerely] wants to get every dollar they're entitled to, then what they should be doing is encouraging him to go out and make as much money as he can.  But everybody on that side of the room has been saying wait a minute, you can't do that.  Don't go make money, don't just — because this case between Mr. Bunting and Ms. Kozlowski, I will tell the Court quite frankly is not about money.

It's not like somebody is — somebody is hurting for money over there and saying hey, this and that.  This is about blood.  This is about a relationship that went back, people who were married for — tens of years, 28 years, I believe.

Hr'g Tr. 61, 62, 63–64, *attached as* ECF No. 4-2, at 284, 285, 286–87.  Appellant concluded:

All [the Debtor] wants is a fair chance to be able to clear the record and say hey, this is what's fair, this is what's not fair.  For one as much as if he stays — you know, if he stays in a Chapter 7 case and he gets liquidated, I might get paid faster.  And I'm — believe me when I tell the Court that I would — I would be very happy to get paid.

But as I've said to the Court numerous times, I'm interested in what's fair because at the end of the day I got to go home and when I go into my bathroom, I've got

to look at myself in the mirror and I got to say to myself, were you being fair, were you being — were you being just to your client . . . .

I think the final point that I wanted to mention is that when this case was originally filed back in April, it was filed by my office as [an] involuntary Chapter 7. Quite frankly I could have done it as an involuntary Chapter 11 at that point and in retrospect maybe I should have.

I would tell the Court very frank — very candidly, the reason I didn't do it was because I didn't have the extra $800 to pay the filing fee at the time. . . . [T]hat probably in retrospect was not the best thing to do certainly for Mr. Bunting's sake, but that's water [under] the bridge right now.

I still think he's entitled to that chance. I certainly don't want to be in a position to say to someone hey, you know, I'm the one who caused you to — to have — you know, all these difficulties.

Hr'g Tr. 70–71, *attached as* ECF No. 4-2, at 293–94. The bankruptcy court denied the motion to convert the case from Chapter 7 to Chapter 11. Order Denying Debtor's Motion for Conversion to Chapter 11, *In re Bunting*, No. 07-20864 (Bankr. E.D. Mich. Dec. 7, 2007), ECF No. 329.

**5**

On November 15, 2007, the Michigan Court of Appeals dismissed *Bunting V* for lack of jurisdiction. *Id.* at 15. (*Bunting III* remained pending.)

On February 13, 2008, Appellee filed a secured claim for $1,283,557.55. *Id.* at 21. The same day, Appellant filed a secured claim for $152,137.95. *Id.*

**6**

On May 13, 2008, the Michigan Court of Appeals decided *Bunting III*, affirming the circuit court's judgment that the Debtor owes Appellee $956,802.83, plus statutory interest. *Bunting v. Bunting* (*Bunting III*), No. 272975, 2008 WL 2037774 (Mich. Ct. App. May 13, 2008) (per curiam).

-19-

**7**

On June 2, 2008, Appellant filed an objection to the Appellee's secured claim of $1,283,557.55. Appellant's Br. 21. Appellant first objected to Appellee's assertion that she is a secured creditor, writing that "there is no basis for Kozlowski to suggest that Kozlowski is a secured creditor as Kozlowski's liens from the divorce judgment were extinguished by the Michigan Court of Appeals July 27, 2007 Opinion and Order and by the Washtenaw County Circuit Court's January 21, 2005 Order." Sandweiss Objection to Kozlowski Claim ¶ 3, *In re Bunting*, No. 07-20864 (Bankr. E.D. Mich. June 2, 2008), ECF No. 457. Additionally, Appellant objected to the amount that Appellee claimed.

Three days later, the Debtor amended his Bankruptcy Schedule C ("property claimed as exempt") to claim an exemption for the full value of the Cape Coral property as his homestead. Amended Schedules, *In re Bunting*, No. 07-20864 (Bankr. E.D. Mich. June 5, 2008), ECF No. 464. The trustee promptly objected to this exemption. Trustee's Objection to Debtor's Claim of Exemptions, *In re Bunting*, No. 07-20864 (Bankr. E.D. Mich. June 12, 2008), ECF No. 474.

A hearing was held on the objections of Appellant and the trustee on September 12, 2008. Appellant's Br. 21. Supplemental briefing was ordered. *Id*.

On February 27, 2009, the bankruptcy court issued an order on Appellant's objections. Opinion Regarding Secured Status of Claim of Kozlowski and Debtor's Claim of Exemptions, *In re Bunting*, No. 07-20864 (Bankr. E.D. Mich. Feb. 27, 2009), ECF No. 701. The court first concluded that Appellee is a secured creditor because *Bunting I* vacated the blanket lien contained in the consent judgment of divorce — but not the specific liens that are also contained in that judgment. *Id*. at 5. The court explained that the consent judgment's

> reference to the lien in "all property awarded to Defendant" can and does only
> refer to the later granting of a lien identified near the end of the Consent Judgment

of Divorce. . . .  The Court of Appeals' opinion is silent as to specific properties
on which a lien was retained by Ms. Kozlowski.  There is nothing in the record to
suggest that the Michigan Court of Appeals glossed over this distinction.  The
Opinion of the Michigan Court of Appeals contains numerous references to
specific property and acts of the parties, so it clear to this Court that the Michigan
Court of Appeals was thoughtfully specific in its direction to the Circuit Court.

Moreover, the Conforming Order specifically vacated the blanket lien and ordered
that it would have no force and effect.  The Conforming Order continued to state
that Ms. Kozlowski retained liens on the four parcels of real estate and cash value
or proceeds on the Debtor's Equitable Life Insurance Policy. . . .

The Court concludes that the Conforming Order did nothing more than reiterate
Ms. Kozlowski's continuing liens in these properties.

*Id*. (emphasis omitted).  Turning to the trustee's objection that the Cape Coral property did not

qualify for the homestead exemption, the court concluded "that the Trustee has not met his

burden under either of his Section 522(b)(3)(A) or Section 522(p)(1) arguments.  Debtor may

exempt his interest completely in the Cape Coral Property pursuant to Section 522(b)(3)(A)."  *Id*.

at 9–10.

**8**

The bankruptcy court then invited the parties to file supplemental motions regarding

Appellee's claim.  Appellant's Br. 22.  On May 5, 2009, Appellant filed four motions, including:

(1) a motion to disallow the claim for $187,830.16 in sanctions against the Debtor; (2) a motion

to disallow the claim for $133,521.01 in post-petition attorney fees; (3) a motion to disallow the

claim for $24,135.10 in accounting fees; and (4) a motion to disallow the claim for "$711,723.89

Believed To Represent Claim For Attorney Fees."  Sandweiss Motions, *In re Bunting*, No. 07-

20864 (Bankr. E.D. Mich. May 5, 2009), ECF Nos. 741, 743, 745, 747.

The Debtor also filed a number of objections.  *See* Opinion Regarding Objections Filed

by Debtor, Sandweiss, and Jahr to Claim of Kozlowski, at 1, *In re Bunting*, No. 07-20864

(Bankr. E.D. Mich. Sept. 28, 2010) ("The Debtor, in particular, has filed at least 19 pleadings

with this Court attacking Ms. Kozlowski's proof of claim and scores of additional pleadings indirectly attacking Ms. Kozlowski's proof of claim. To that end, the Debtor has submitted to the Court 137 exhibits including the 59 files and letters and various other pleadings submitted by the Debtor as part of the record in this case."), ECF No. 926.

A hearing was held on the motions in July 2009. Appellant's Br. 23. Following the hearing, supplemental briefing was requested. *Id.*

**9**

The bankruptcy court issued its first opinion on the objections of Appellant and the Debtor in September 2010. Opinion Regarding Objections Filed by Debtor, Sandweiss, and Jahr to Claim of Kozlowski, *In re Bunting*, No. 07-20864 (Bankr. E.D. Mich. Sept. 28, 2010), ECF No. 926. Applying the *Rooker–Feldman* doctrine, the court concluded:

> In this case, it is clear that the Washtenaw County Circuit Court spent many hours on this case and reached conclusions and made decisions as a result of hearings and evidence presented to that court. Afterward, Debtor took various claims of appeal, as is his right in Michigan, to the Michigan Court of Appeals and had some portions of the Consent Judgment reversed. Other provisions of the Consent Judgment, however, were not reversed. The later decisions of the Michigan Court of Appeals likewise addressed claimed errors of the Washtenaw County Circuit Court by the Debtor, and it appears from the reading of the Opinions of the Michigan Court of Appeals that the Washtenaw County Circuit Court was affirmed. While Debtor may assert that these decisions were in error, this Court is satisfied that they were not procured through fraud, deception, accident, or mistake, so as to provide an exception to application of the *Rooker/Feldman* doctrine. . . .
>
> [T]he Washtenaw County Circuit Court and the Michigan Court of Appeals dealt in great detail with the various claims of credit of the Debtor. It appears from the review of the record that the Washtenaw County Circuit Court considered these claims and acted accordingly and that the Michigan Court of Appeals upheld the decisions of the Washtenaw County Circuit Court. While this Court cannot say with certainty that it would have reached the same conclusion as the Washtenaw County Circuit Court, the record before the Court, as presently presented, does not compel this Court to deviate from decisions made by the state courts.

*Id.* at 14, 17.   The court reserved judgment on several of the issues raised by Appellant's motions, ordering supplemental briefing on these issues, as well as whether the *Rooker–Feldman* doctrine should apply to Appellant.   Order Regarding Objections to Claim of Kozlowski, *In re Bunting*, No. 07-20864 (Bankr. E.D. Mich. Nov. 5, 2010), ECF No. 943.   The parties then submitted another round of supplemental papers.

**10**

In September 2011, the bankruptcy court issued an opinion overruling the remaining objections of Appellant.   Opinion Regarding Continuing Objections Filed By Debtor, Sandweiss, and Jahr to Claim of Kozlowski, *In re Bunting*, No. 07-20864 (Bankr. E.D. Mich. Sept. 29, 2011), ECF No. 974.   First, the court concluded that the *Rooker–Feldman* doctrine barred Appellant's remaining objections, explaining that while the doctrine generally does not apply to third parties to the state court action, "the Court discerns at least two narrow exceptions carved out from this general exception by the Sixth Circuit" — prior representation and privity.   *Id.* at 5. Discussing the first, the court explained:

> The first exception applies when counsel for the state court party that lost advocates on behalf of the former client in a federal action. . . .
>
> Ms. Kozlowski argues here that "the arguments being presented by SLC are essentially as proxy for the Debtor" and that "SLC has taken on the mantle of the Debtor" to advance his claims.   The Court agrees and interprets SLC's objections as essentially seeking on behalf of Debtor to undo the Washtenaw County Circuit Court's judgments.

*Id.* at 5, 6 (brackets omitted).   Turning to the second exception, the court continued:

> The second exception carved out of the non-party exception is for a non-party in privity with the state court losing party. . . .
>
> A privy of a party includes a person so identified in interest with another that he represents the same legal right, including, a principal to an agent, or a master to a servant.   As stated by the Michigan Supreme Court, Clearly, the word "attorney" connotes an agency relationship between two people.

> SLC represented Debtor during portions of the state court litigation, including post-judgment litigation regarding amounts due Ms. Kozlowski, and challenged various aspects of the divorce judgment and fees and costs awarded her. Under Michigan law, this attorney-client relationship is sufficient to find that SLC is Debtor's privy. SLC has so identified itself with Debtor's interest by virtue of its statements that it believes Debtor's various objections are not only meritorious but also valid. In essence, SLC represents the same interest as that of the Debtor — to reduce the amount due to Ms. Kozlowski pursuant to the divorce judgment and post-judgment state court orders. The fact that SLC has other motives, namely to obtain the disallowance of Ms. Kozlowski's claim either entirely or in part so as to increase its potential recovery from Debtor's estate, does not change the analysis.

*Id*. at 6, 10 (internal citation and quotation marks and omitted) (quoting *Omdahl v. W. Iron Cnty. Bd. of Educ.*, 733 N.W.2d 380, 384 (Mich. 2007); *Begin v. Mich. Bell Tel. Co.*, 773 N.W.2d 271, 283 (Mich. Ct. App. 2009). "Applying the foregoing law to SLC's remaining open objections," the court wrote, "it is clear each seeks relief from some portion of an order by the Washtenaw County Circuit Court or the Michigan Court of Appeals. *Id*. at 12. Finally, holding in the alternative, the court further found that even if the *Rooker–Feldman* doctrine did not bar the objections, res judicata did. *Id*. at 16–18.

Appellant then filed a motion for reconsideration, which was denied. Appellant's Br. 24. This appeal followed.

## II

The United States Code provides that this court has jurisdiction to hear appeals from "final judgments, orders, and decrees" of the bankruptcy court. 28 U.S.C. § 158(a)(1).

The bankruptcy court's findings of fact are reviewed for clear error; its conclusions of law are reviewed de novo. *In re Wingerter*, 594 F.3d 931, 935–36 (6th Cir. 2010).

-24-

**III**

Appellant enumerates three principal arguments why this Court should reverse various orders entered by the bankruptcy court.

**A**

First, Appellant argues that the state circuit court was biased against Appellant, and thus the bankruptcy court erred in lifting the stay in 2007 to allow the state circuit court to determine the amount that Appellee was entitled to.  As evidence of bias, Appellant writes that "throughout the limited time that SLC represented the Debtor  in the divorce proceedings the Court was less than civil with the undersigned."  Appellant's Br. 27. As further evidence of bias, Appellant asserts: "Kozlowski and her attorneys, together with the state court receiver, and Judge Connors colluded with each other and entered an order in order (without the knowledge or consent of Mr. Bunting or his attorney) to attempt to defraud both SLC and Mr. Bunting and avoid paying SLC's Judgment Lien."  Appellant's Br. 28 (emphasis omitted).  Thus, Appellant concludes, "The bankruptcy court abused its discretion by allowing the divorce court to determine the amount of Kozlowski's claim as Kozlowski never showed a reason why she would be harmed by having the bankruptcy court make that determination, yet, the divorce court's statements and orders showed a bias against SLC." Appellant's Br. 24–25.

Appellant's objection to the lifting of the automatic stay was not timely made.  And even if it was, it would lack merit.

**1**

The United States Code provides: "The district courts of the United States shall have jurisdiction to hear appeals . . . from final judgments, orders, and decrees."  28 U.S.C. § 158(1). "The notice of appeal shall be filed with the clerk within 14 days of the date of the entry of the

judgment, order, or decree appealed from," Federal Rule of Bankruptcy Procedure 8002(a) provides. "As the rule is jurisdictional, failure to file a timely notice requires an appeal be dismissed for lack of jurisdiction." *In re Dow Corning Corp.*, 255 B.R. 445, 465 (E.D. Mich. 2000) (citing *Walker v. Bank of Cadiz In re LBL Sports Ctr., Inc.*, 684 F.2d 410, 412 (6th Cir. 1982)), *aff'd*, 280 F.3d 648 (6th Cir. 2002).

The Sixth Circuit, in accord with other circuits addressing the issue, holds that "a bankruptcy court's lifting of an automatic stay is a final order for appeal purposes." *In re Sun Valley Foods Co.*, 801 F.2d 186, 190 (6th Cir. 1986) (collecting cases); *accord In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1283 (2d Cir. 1990) ("All seem to agree that orders lifting the automatic stay are final because the issue of whether the litigation in question may proceed has been resolved and because an immediate appeal by the trustee or debtor is necessary if there is to be appellate review at all."); *see generally* Harry Perrin & Justin Toth, *Litigating the Motion for Relief from the Automatic Stay*, 4 J. Bankr. L. & Prac. 459, 493 (1995) ("[C]ourts have uniformly held that an order providing relief from the stay is final and appealable."). The Sixth Circuit explains:

> Congress intended the courts to conclusively and expeditiously adjudicate, apart from the bankruptcy proceedings as a whole, complaints for relief from the automatic stay. Immediate appeal from decisions of the bankruptcy court is plainly necessary to fulfill such congressional intent. We hold, therefore, that decisions of the bankruptcy courts granting or denying relief from the automatic stay are final decisions.

*Id.* (brackets and ellipses omitted) (quoting *In re Kemble*, 776 F.2d 802, 805 (9th Cir. 1985)); *see In re Lee*, 467 B.R. 906, 911 (B.A.P. 6th Cir. 2012) ("An order granting relief from the

-26-

automatic stay is . . . a final, appealable order."); *see generally* 9E Am. Jur. 2d *Bankruptcy* § 3785 (2012) (collecting cases).[6]

     Here, the bankruptcy court order lifting of the automatic stay was entered in April 2007. Appellant noticed its appeal in December 2011. Because the appeal of the bankruptcy court's order lifting the automatic stay was not noticed within fourteen days of the entry of the order, this Court lacks jurisdiction to consider the appeal from this order.

**2**

     Even if this Court had jurisdiction to consider the appeal of the lifting of the stay, moreover, Appellant would not be entitled to the relief sought. The bankruptcy court did not abuse its discretion in lifting the stay.

     The United States Code provides: "On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay . . . for cause." 11 U.S.C. § 362(d)(1).

     "Cause" is not a defined term, the Sixth Circuit observes, "so courts must determine whether discretionary relief is appropriate on a case-by-case basis." *In re Trident Assoc. Ltd. P'ship*, 52 F.3d 127, 131 (6th Cir. 1995) (quotation marks omitted) (quoting *In re Laguna Assoc. Ltd. P'ship*, 30 F.3d 734, 737 (6th Cir. 1994)). That is, whether to grant such relief "resides within the sound discretion of the bankruptcy court." *In re Garzoni*, 35 F. App'x 179, 181 (6th Cir. 2002) (citing *In re Laguna Assocs., Ltd. P'ship*, 30 F.3d 734, 737 (6th Cir. 1994); *In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1286 (2d Cir. 1990)).

---

[6] There is, it must be acknowledged, some authority to the contrary. In an unpublished decision entered about twenty years ago, a district court concluded that a bankruptcy court order lifting an automatic stay "is not technically 'final.' " *In re IPG Holdings, Inc.*, Nos. 90-71157, 90-71464, 1991 U.S. Dist. LEXIS 19661, at *4 (E.D. Mich. May 8, 1991) (Friedman, J.), *cited in* Appellant's Br. 11–12. This view, however, is in the distinct minority.

To guide the bankruptcy court's exercise of its discretion, however, the Sixth Circuit identifies five factors for the court to consider: (1) "judicial economy"; (2) "trial readiness"; (3) "the resolution of preliminary bankruptcy issues"; (4) "the creditor's chance of success on the merits"; and (5) "the cost of defense or other potential burden to the bankruptcy estate and the impact of the litigation on other creditors."  *In re Garzoni*, 35 F. App'x at 181 (citing *In re United Imports, Inc.*, 203 B.R. 162, 167 (Bankr. D. Neb. 1996)).

This Court may reverse the bankruptcy court's decision to lift the automatic stay only if left "with a definite and firm conviction that it erred in its factual findings or legal conclusions." *In re Garzoni*, 35 F. App'x at 181  (citing *Davis v. Jellico Cmty. Hosp., Inc.*, 912 F.2d 129, 133 (6th Cir. 1990)).  Here, no such conviction of error is present.  Rather, a review of the factors enumerated above demonstrates that the bankruptcy court acted reasonably in lifting the stay.

First, judicial economy favored lifting the stay.  The state trial court judge, Judge Connors, had been involved with the case for nearly seven years.  The issues he was called on to decide — the amount due to Appellee pursuant to the judgment of divorce, as well as the appropriate size of the sanction against the Debtor for not complying with Judge Connors' prior orders — not only involved factual questions that he was uniquely well suited to answer, but legal issues that he was particularly well versed in.

Second, trial readiness also favored lifting the stay.  At the time the stay was lifted, the state trial court had ordered, and received, both evidence and briefing.  As Appellee observes, that court "already had all of the documentation and evidence in its hands in order to rule in the matter and a decision could be made almost immediately.  In fact, such a decision was ultimately made by Judge Connors the business day after the Bankruptcy Court's order lifting the stay." Appellee's Br. 22.

The third factor, resolution of preliminary bankruptcy issues, neither supports nor undermines lifting the stay. How much Debtor owed Appellee pursuant to the divorce judgment (and related state court litigation) was one issue in the bankruptcy proceeding. But it was also an issue that the state court was particularly well-suited to answer.

The fourth factor, the cost of re-litigating the same issues, favored lifting the stay. Those issues, as noted, had consumed years of litigation in state court.

The fifth and final factor, the likelihood of success on the merits of the creditor (Appellee), also favored lifting the stay. As she notes, "At the time of Kozlowski's motion to lift the stay there had been no less than three appeals in the state court matter. In every instance Kozlowski had been successful." Id. at 24. And, as noted, one business day after the stay was lifted, an order was entered by the state court in Appellee's favor. It identified the precise amount due to Appellee pursuant to the judgment of divorce, $1,189,944.69. *See* ECF No. 3-2, at 171–72 (order). And it identified the precise amount of sanctions against the Debtor for not complying with the court's orders regarding the Cape Coral property, $180,000. *Id.*

The bankruptcy court did not abuse its discretion in lifting the stay.

Against this conclusion, as noted, Appellant argues that the court did abuse its discretion because the state court judge, Judge Connors, was biased. *See* Appellant's Br. 27–28. A review of the record, however, does not leave the reader with a definite and firm conviction that the bankruptcy court erred in concluding that the state court would perform its responsibilities in a judicious, evenhanded manner.[7] Rather, as detailed above, the record demonstrates that the

---

[7] As an aside, the Washenaw County Trial Court website reports that Judge Connors "is a three time recipient of the Justice Blair Moody Award for Significant Contributions to Judicial Excellence" and in 2009 "was presented with the Patriot Award for Outstanding Service to the Bench, the Bar, and the Community from the Washtenaw County Bar Association." *Judge Timothy P. Connors*, Washtenaw County Trial Court, *available at* http://washtenawtrialcourt.org/general/judge_profiles/index_html#TPC (last visited January 15, 2013). A state court judge since 1991, Judge Connors "teaches at the University of Michigan Law School, Wayne State University Law School, and the Thomas M. Cooley Law School." *Id.*

-29-

bankruptcy court reasonably concluded that the state court would continue to handle the long-fought, contentious divorce in an impartial, objective manner.

In sum, even if the objection to lifting the stay was properly before this court — which it is not — the bankruptcy court did not abuse its discretion in lifting the stay.

**B**

Next, Appellant argues, the bankruptcy court erred in overruling Appellant's objection that Appellee was not a secured creditor. Specifically, Appellant asserts, "The bankruptcy court erred by overruling SLC's objections to Kozlowski's claim and determining that Kozlowski is a secured creditor even though: (a.) the Michigan Court of Appeals struck Kozlowski's liens and Kozlowski never re-recorded them; (b.) Kozlowski failed to follow the divorce court's direction that, to be effective, Kozlowski needed to record a conforming order with the register of deeds in the counties where Kozlowski was seeking to enforce her purported lien." Appellant's Br. 25.

Put differently, Appellant argues that *Bunting I* extinguished the ex-wife's liens. And the ex-wife never re-recorded them. Therefore, Appellant concludes, Appellee was not a secured creditor and the bankruptcy court's decision to the contrary is clearly erroneous.

Appellant's argument lacks merit. To understand why, a reexamination of the procedural history from 2002 through 2005 is necessary.

**1**

The consent judgment of divorce entered on March 14, 2002, specifically identified a number of properties owned by the parties and the disposition of each property, including, when applicable, the security interests retained in that property by the transferring party. In particular, at pages four through eight of the consent judgment, Appellee is granted a security interest in

each of the four real properties awarded to the Debtor — the Town Lake, Kelly Lake, Burbank, and Islandia properties. Consent Judgment of Divorce 4–8, ECF No. 3-3, at 37–48.

The judgment also granted Appellee a blanket security interest over every asset awarded to the Debtor pursuant to the judgment. *Id*. at 25. In particular, at page 25 the judgment provides: "Plaintiff Virginia Bunting is granted a security interest in the assets awarded to Defendant Harold Bunting until all financial obligations by Defendant as provided by this Consent Judgment are fully met." *Id*.

And the judgment restricted the Debtor's ability to encumber or transfer the Kelly Lake and Townline Lake properties until he had met all his obligations under the consent judgment. *Id*. at 9–10.

Appellee promptly perfected her liens by recording a copy of the judgment with the appropriate registers of deeds.

The Debtor then appealed from the entry of the consent judgment of divorce to the Michigan Court of Appeals (that is, he initiated *Bunting I*).

While this appeal was pending, the Debtor filed a Chapter 11 petition in the United States Bankruptcy Court for the Eastern District of Michigan.

In July 2004, the Michigan Court of Appeals decided *Bunting I*. Concluding that the blanket security interest granted to Appellee was improperly awarded, the court explained:

> In comparing the consent judgment with the settlement agreement on the record, we find that the consent judgment did not comport with the agreement on record with respect to the following items: the consent judgment improperly restricted defendant's ability to transfer or encumber the Kelly Lake and Townline Lake properties, improperly gave plaintiff a lien in all property awarded defendant, and permitted plaintiff to convey defendant's interest after all terms of the consent judgment had been satisfied while requiring defendant to immediately convey plaintiff's interest. There was clearly disagreement with respect to the lien provisions, and plaintiff should not have been permitted to unilaterally add the lien provisions to the consent judgment.

-31-

2004 WL 1672425, at *3.  And so the court reversed and remanded for the entry of an order

consistent with its opinion.  *Id.* at 6.

Filing for bankruptcy protection, however, had imposed an automatic stay on the state

court proceedings.  The parties to the bankruptcy proceeding, however, agreed to lift the stay to

enforce *Bunting I*.  *See* Stipulated Order Lifting Stay 1, ECF No. 4-3, at 104–05.  On November

9, 2004, a stipulated order was entered in the bankruptcy court lifting the automatic stay "to

allow the Washtenaw County Circuit Court to modify the Judgment of Divorce pursuant to the

terms of the Court of Appeals decision."  *Id*.  The circuit court did so, entering a conforming

order that provided in pertinent part:

> IT IS FURTHER ORDERED AND ADJUDGED that the provisions in the March
> 14, 2002, Consent Judgment of Divorce establishing liens in favor of the Plaintiff
> in all property of the Defendant are hereby vacated and shall have no force and
> effect.
>
> IT IS FURTHER ORDERED AND ADJUDGED that Plaintiff's interest in the
> property awarded to Defendant shall be secured by liens in each of the properties
> listed below, which properties were awarded to Defendant in the Consent
> Judgment of Divorce; these liens shall remain in effect until such time as
> Defendant has satisfied his obligations to Plaintiff pursuant to the Consent
> Judgment of Divorce, as modified by this order and/or other post-judgment orders
> of this Court.  Pursuant to this order, Plaintiff retains liens in the following
> properties:
>
>> A.    Kelly Lake property;
>> B.    Townline Lake property;
>> C.    3505 Burbank, Ann Arbor, Michigan;
>> D.    8639 Columbia, Dearborn Heights, Michigan;
>> E.    Cash value or proceeds of Defendant's Equitable Life
>>        Insurance Policy.

Conforming Order 2, ECF No. 2-1, at 57.

This order, it must be acknowledged, is not without its difficulties.  The first paragraph

provides that the terms of the consent judgment of divorce that establish "liens in favor of the

Plaintiff in all property of the Defendant are hereby vacated."  Yet the next paragraph provides

that four specific liens "remain in effect" — reiterating that Appellee "retains" these liens.

Difficulties of interpretation that appear on casual inspection, however, disappear when

these two paragraphs are read in context.  As noted, the consent judgment awarded Appellee two

types of liens: a blanket lien in all of the Debtors property (that is, a lien "in all property" of the

Debtor, and specific liens in four particular parcels).  In *Bunting I*, the court of appeals instructed

that the blanket lien was improperly granted.  And so the conforming order "vacated" the blanket

lien, while ordering that Appellee "retains" her specific liens.

Appellee is thus a secured creditor.  The blanket lien was vacated by *Bunting I* and the

subsequent conforming order — but the specific liens in particular properties were not.  As Judge

Opperman observed,

> It is noteworthy that the Michigan Court of Appeals specifically reversed
> paragraph 8 in regard to Kelly Lake and Townline Lake.  The reference to the lien
> in "all property awarded to Defendant" can and does only refer to the later
> granting of a lien identified near the end of the Consent Judgment of Divorce. . . .
>
> The Court of Appeals' opinion is silent as to specific properties on which a lien
> was retained by Ms. Kozlowski.  There is nothing in the record to suggest that the
> Michigan Court of Appeals glossed over this distinction. . . .
>
> Moreover, the Conforming Order specifically vacated the blanket lien and ordered
> that it would have no force and effect.  The Conforming Order continued to state
> that Ms. Kozlowski retained liens on the four parcels of real estate and cash value
> or proceeds on the Debtor's Equitable Life Insurance Policy. . . .
>
> The Court concludes that the Conforming Order did nothing more than reiterate
> Ms. Kozlowski's continuing liens in these properties.

Opinion Regarding Secured Status of Claim of Kozlowski and Debtor's Claim of Exemptions 5,

*In re Bunting*, No. 07-20864 (Bankr. E.D. Mich. Feb. 27, 2009) (emphasis omitted), ECF No.

701.

Because Appellee had perfected her liens in 2002, and because the liens in the particular properties were not vacated by either *Bunting I* or the conforming order, no further action to perfect these liens was necessary.  Appellee is a secured creditor.

### 2

Arguing against this conclusion, Appellant relies on *Bunting II*, decided by the Michigan Court of Appeals in December 2006.

In *Bunting II*, the Debtor appealed the entry of the conforming order, asserting that "plaintiff was attempting to reassert liens rejected in *Bunting [I]*" and "the trial court erred in not striking the lien provision imposed against the [five enumerated properties in the conforming order]."  *Bunting II*, No. 260869, 2006 WL 3826749, at *1, 2 (Mich. Ct. App. Dec. 28, 2006).

Rejecting the Debtor's arguments, the court of appeals wrote that the circuit court "correctly modified the consent judgment to conform to *Bunting [I]*, including exercising its equitable powers to impose liens," *id*. at 3, elaborating:

> When a court provides a lien on marital property, it impliedly grants money to one of the parties; a lien is a security interest for money owed by one party to the other.  A court possesses inherent authority to enforce its own directives.  A divorce case is equitable in nature, and a court of equity molds its relief according to the character of the case; once a court of equity acquires jurisdiction, it will do what is necessary to accord complete equity and to conclude the controversy.  In addition, [Mich. Comp. Laws §] 600.611 provides circuit courts with jurisdiction and power to make any order proper to fully effectuate the circuit courts' jurisdiction and judgments. . . .

> The trial court's exercise of its equitable powers did not contravene this Court's directive in *Bunting [I]*, which did not address whether liens could be imposed based on the equitable considerations described above.  We hold, on the particular facts before us, that the law of the case doctrine does not preclude the trial court's provision of liens on properties owned by Bunting because the trial court applied equitable principles in awarding Kozlowski liens given Bunting's demonstrated noncompliance with the trial court's orders.

-34-

*Id*. at 2 (ellipsis and quotation marks omitted) (quoting *Walworth v. Wimmer*, 504 N.W.2d 708, 708 (Mich. Ct. App. 1993)).  Thus, the court of appeals concluded that the imposition of the liens was an exercise of the equitable powers of the circuit court rather than the parties' private agreement.

The court of appeals did not, however, conclude that the conforming order created rather than reaffirmed the existence of the liens.  That is, *Bunting II* doesn't deal with the when — but the why.  It doesn't deal with the timing of when the state circuit court imposed the liens — but why the state circuit court had the power to impose them.  And the plain language of the conforming order demonstrates that it was not creating the liens — but reaffirming their existence.  That order, as noted, directs that Appellee "retains" her liens, not that she is given them.

Reinforcing this conclusion are the decisions of every other court to have dealt with these parties.  First, the state circuit court found that Appellee "retains" her liens.  In *Bunting II*, the Michigan Court of Appeals affirmed that judgment.  And then the bankruptcy court reached the same conclusion, and therefore concluded that Appellee is a secured creditor.  Appellant's argument that the state trial court meant "creates" when it wrote "retains," or that the Michigan Court of Appeals meant "reversed" when it wrote "affirmed," and that the bankruptcy court was just plain wrong when it didn't figure this out, is unpersuasive.

Appellee is a secured creditor.

### C

Finally, Appellant objects: "The bankruptcy court erred by ruling that [Appellant] was in privity with the Debtor and that [Appellant's] motions and objections are precluded by the *Rooker-Feldman* doctrine and/or the related doctrines of res judicata and/or collateral estoppel."

-35-

Appellant's Br. 25.  Relatedly, Appellant asserts, "The bankruptcy court erred by denying [Appellant's] motions and objections to Kozlowski's claim because [Appellant] never had standing to challenge any of the rulings in the state court."  *Id*.  Appellant's arguments lack merit.

**1**

The *Rooker–Feldman* doctrine was established by two Supreme Court decisions, *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983).  The doctrine, "a combination of the abstention and res judicata doctrines, stands for the proposition that a federal district court may not hear an appeal of a case already litigated in state court."  *United States v. Owens*, 54 F.3d 271, 274 (6th Cir. 1995). Elaborating, the Supreme Court explains that

> lower federal courts possess no power whatever to sit in direct review of state court decisions.  If the . . . claims presented to a United States District Court are inextricably intertwined with the state court's denial [of a claim], then the District Court is in essence being called upon to review the state court decision.  This the District Court may not do.

*Feldman*, 460 U.S. at 483 (citation and quotation marks omitted) (quoting *Atl. Coast Line R. Co. v. Engineers*, 398 U.S. 281, 296 (1970)).

As general matter "the *Rooker-Feldman* doctrine is limited to cases brought by state-court losers complaining of injuries by state-court judgments rendered before the district court proceedings commenced."  *Fieger v. Ferry*, 471 F.3d 637, 642 (6th Cir. 2006) (quotation marks omitted) (quoting  *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). That is, the doctrine's application is generally limited to parties to the state court action.

The Sixth Circuit, however, recognizes two exceptions to this general rule.  *See Fieger*, 471 F.3d at 644 n.4; *McCormick v. Braverman*, 451 F.3d 382, 396 (6th Cir. 2006).  Briefly, the

first exception provides that an attorney, "whether on behalf of his clients or on his own behalf[,] cannot seek in federal court to undo a state court judgment." *Fieger*, 471 F.3d at 644 n.4. The second provides a similar prohibition for parties and their privies. *McCormick*, 451 F.3d at 396. Discussing the reason for the second exception (which applies with equal force to the first), the Sixth Circuit explains:

> It would be inconsistent to disallow the party in the state suit to raise a federal claim but to allow his privy to bring the exact same claim. A state party may not circumvent the Article III jurisdictional provisions simply by substituting a privy's name for his own in the federal claim. This is especially true because the source of the injury to the state court loser and his privy would be one and the same: the state court judgment.

*McCormick*, 451 F.3d at 396. Although each exception is narrow, in this case Appellant manages to fit comfortably within both.

**2**

First, the principal issues that Appellant now seeks to litigate — how much Debtor owes the Appellee and whether the Appellee has liens on Debtor's properties — are inextricably intertwined with the prior judgment of the Michigan state courts in this long-running divorce. Moreover, Appellant's own testimony before the bankruptcy court demonstrates that he seeks to undo those prior judgments on behalf of his client, the Debtor.

Appellant initiated this involuntary bankruptcy proceeding on April 5, 2007. Two weeks later, a hearing was held regarding lifting the automatic stay. When Appellant was asked by the court if Appellant should want the stay lifted to maximize the size of the estate by selling a specific parcel (the Townline property) before its value continued to depreciate, Appellant responded:

> Oh, absolutely. But we haven't even — I mean this case is such in its infancy, I haven't had a chance to address that yet. Because that would be — that would be an issue from Mr. Bunting and I'm not clear as to who's representing Mr. Bunting

in this proceeding if I'm going to — if I'm going to be able to do that or if
because I'm a creditor there's a conflict.

Hr'g Tr. 42, Apr. 19, 2007, *attached as* ECF No. 3-1, at 44.  Asked by the court whose interests

he was representing, Appellant answered:

> I'm trying to — I'm trying to play a fine line here.  I don't want to — I don't want
> to prejudice Mr. Bunting as his State Court counsel and that's why I said, all right,
> I'm going to put the interest of my client ahead of the interest of my law firm.
>
> But if anything, you know, I — I think that's — that's — I don't think anybody
> can have a complaint to me about doing that except my wife and my children.
> But certainly, you know, legally I don't think anybody can come to me and say
> well, you're not representing Mr. Bunting properly, you've got a conflict, you're
> not putting your client's interest — and I've talked to the State Bar about this
> issue and I've talked to Mr. Bunting about this issue.
>
> And I told him that I didn't — wouldn't [agree to sell the Townline Lake
> property] because it's not right and quite frankly it's not right from a moral —
> moral perspective and I live my life in such a way that I'm not — I refuse to do
> anything that's going to violate my principles and I don't think that, you know, I
> don't think that selling Townline Lake, even though I've been asked to do it,
> would be the right thing to do morally and I don't want to do that.

Hr'g Tr. 49–50, *attached as* ECF No. 3-1, at 51–52.  Thus, from the outset of the bankruptcy

litigation, Appellant acknowledged that he was "going to put the interest of my client [the

Debtor] ahead of the interest of my law firm."

Several months passed.  On November 8, 2007, the bankruptcy court held a hearing on

several motions, including a motion to convert the Chapter 7 proceeding into a Chapter 11

proceeding.   Providing background on the Debtor's previous Chapter 11 filing, Appellant

explained:

> [T]he previous Chapter 11 case was filed right after Mr. Bunting's divorce. . . .
> Judge Connors at that point had appointed a receiver.  They were trying to
> liquidate property.  And there was a lot more property then.
>
> There was a question under — the big question in that case, and there was a lot of
> time and effort spent arguing over it, was the secured status as to Ms. Kozlowski
> and whether or not she had a — a secured claim, what her priority status was in

terms of getting properties.  And they spent an inordinate amount of time arguing
that back and forth.

That issue finally got resolved by the Michigan Court of Appeals on July 27th of
2004 when they ruled that Ms. Kozlowski did not have — that the liens that were
the original divorce judgment were to be vacated and that it was supposed to —
remanded back to Judge Connors for an order — for an order vacating those liens
which was finally entered on January 21st of 2005.

Hr'g Tr. 58, 60, Nov. 8, 2007, *attached as* ECF No. 4-2, at 281, 283.  (In the bankruptcy case, of

course, one of the principal issues that Appellant seeks to litigate is Appellee's status as a

secured creditor.)

Turning to why the pending Chapter 7 proceeding should be converted into Chapter 11

proceeding, Appellant continued:

The fact is that this was the impression that [the Debtor] got why — as to why he
dismissed his previous Chapter 11.  And I think that's very important when —
when the Court asked, well what happened — what's different in this case?

I think what is different in this case is that number one, we've got established
criteria.  One of the things that [I did] when I got back involved in this case, or
seriously involved in this case last April, a year and a half ago, there was an issue
before Judge Connors at that time as to how much Mr. Bunting was indebted to, if
any, to Mrs. — Ms. Kozlowski.

And we went back and forth on that number and I finally sat down.  Mr. Bunting
kept saying to me, he says, and as the Court knows I was representing him in the
action, I've got all these credits due me. . . .

And I went and spent a lot of time, hours and hours comparing the different orders
from the Washtenaw County Court and there was probably, I don't know, close to
100 of them and saying you're right on this, you're wrong on this, you're right on
this.  And finally we formulated it into briefs that went before Judge Connors and
Judge Connors ruled against him on some of those issues.  And that's why there
was an appeal pending that's commonly known as *Bunting [III]*.

Hr'g Tr. 61, 62, 63–64, *attached as* ECF No. 4-2, at 284, 285, 286–87.  (In *Bunting III*, as noted,

the court of appeals affirmed the trial court's decision on how much Debtor owed Appellee.

This too, of course, is another of the principal issues that Appellant seeks to litigate in the bankruptcy case.)

Concluding his argument on why the case should be converted from a Chapter 11 to a Chapter 7 filing, Appellant explained:

> All [the Debtor] wants is a fair chance to be able to clear the record and say hey, this is what's fair, this is what's not fair.  For one as much as if he stays — you know, if he stays in a Chapter 7 case and he gets liquidated, I might get paid faster.  And I'm — believe me when I tell the Court that I would — I would be very happy to get paid.

> But as I've said to the Court numerous times, I'm interested in what's fair because at the end of the day I got to go home and when I go into my bathroom, I've got to look at myself in the mirror and I got to say to myself, were you being fair, were you being — were you being just to your client . . . .

> I think the final point that I wanted to mention is that when this case was originally filed back in April, it was filed by my office as [an] involuntary Chapter 7.  Quite frankly I could have done it as an involuntary Chapter 11 at that point and in retrospect maybe I should have.

> I would tell the Court very frank — very candidly, the reason I didn't do it was because I didn't have the extra $800 to pay the filing fee at the time. . . .  [T]hat probably in retrospect was not the best thing to do certainly for Mr. Bunting's sake, but that's water [under] the bridge right now.

> I still think he's entitled to that chance.  I certainly don't want to be in a position to say to someone hey, you know, I'm the one who caused you to — to have — you know, all these difficulties.

Hr'g Tr. 70–71, *attached as* ECF No. 4-2, at 293–94.  (Thus, once again, Appellant expressly acknowledged that his principal concern in the bankruptcy litigation is caring not for his own interests, but his client's — the Debtor's.)

Not only does Appellant's testimony demonstrate that he is seeking to re-litigate the decisions of the Michigan state courts, his specific objections to the Appellee's claims do as well.

As noted, Appellant's principal objections to the Appellee's claim concern the amount of the claim ($1,283,557.55) and the assertion that it is secured by liens on the Debtor's property. Sandweiss Objection to Kozlowski Claim, *In re Bunting*, No. 07-20864 (Bankr. E.D. Mich. June 2, 2008), ECF No. 457.

The first of these objections, as noted, is the precise subject matter of *Bunting III*. *See Bunting III*, 2008 WL 2037774, *1 ("Defendant appeals by leave granted the trial court's order determining the amount that he owes plaintiff pursuant to the parties' consent judgment of divorce. We affirm."). And the second is inextricably intertwined with *Bunting II*. *See Bunting II*, 2006 WL 3826749, at *1–2 (rejecting the Debtor's argument that Appellee "was attempting to reassert liens rejected in *Bunting I*"). Consequently, Appellant cannot re-litigate those issues in federal court.

The Sixth Circuit instructs that the *Rooker-Feldman* doctrine prohibits an attorney "(whether on behalf of his clients or on his own behalf) cannot seek in federal court to undo a state court judgment." *Fieger v. Ferry*, 471 F.3d 637, 644 n.4 (6th Cir. 2006). The bankruptcy court correctly concluded that Appellant's objections to Appellee's claim are barred by the *Rooker-Feldman* doctrine.

**3**

Finally, it should be noted, the bankruptcy court was also correct that Appellant's objections to Appellee's claim are barred because the Appellant is in privity with the Debtor.

The Sixth Circuit, as noted, instructs that although the *Rooker-Feldman* doctrine generally applies only to "state court losers," "a person in privity with the actual party who loses in state court may be deemed a state-court loser." *McCormick v. Braverman*, 451 F.3d 382, 396 (6th Cir. 2006).

Privity, the Sixth Circuit further instructs, requires two elements: (1) "a substantial identity of interests"; and (2) "a working functional relationship in which the interests of the nonparty are presented and protected by the party in the litigation." *Bates v. Twp. of Van Buren*, 459 F.3d 731, 734-35 (6th Cir. 2006) (applying Michigan law) (quotation marks and brackets omitted) (quoting *Adair v. State*, 680 N.W.2d 386, 396 (Mich. 2004)).

Here, both elements are satisfied.  First, the two had a substantial identity of interests — minimizing the amount the Debtor owes Appellee.  In contrast, Appellant testified that he was not interested in maximizing his own recovery at the expense of his client, explaining:

> I think that's — that's — I don't think anybody can have a complaint to me about doing that except my wife and my children.  But certainly, you know, legally I don't think anybody can come to me and say well, you're not representing Mr. Bunting properly, you've got a conflict, you're not putting your client's interest [ahead of your own].

Hr'g Tr. 49, Apr. 19, 2007, *attached as* ECF No. 3-1, at 51.  Likewise, from the outset of the bankruptcy litigation Appellant acknowledged that he was "going to put the interest of my client [the Debtor] ahead of the interest of my law firm."  Hr'g Tr. 49.  The first element is satisfied.

As is the second.  As noted, Appellant began representing the Debtor in 2004.  Hr'g Tr. 176, Nov. 8, 2007, *attached as* ECF No. 4-2, at 399.  He represented him in state circuit court and on appeal to the Michigan Court of Appeals.  And he continued to effectively represent him after initiating the bankruptcy court proceedings.  As the bankruptcy court cogently observed,

> [Appellant] has so identified itself with Debtor's interest by virtue of its statements that it believes Debtor's various objections are not only meritorious but also valid.  In essence, [Appellant] represents the same interest as that of the Debtor — to reduce the amount due to Ms. Kozlowski pursuant to the divorce judgment and post-judgment state court orders.  The fact that [Appellant] has other motives, namely to obtain the disallowance of Ms. Kozlowski's claim either entirely or in part so as to increase its potential recovery from Debtor's estate, does not change the analysis.  [Appellant's] objections are nothing more than claims filed by a privy of the state court loser that assert an injury caused by the state court judgment.  This Court finds that, pursuant to *McCormick* and Michigan

-42-

privity law, [Appellant] is deemed to be "the state-court loser" for purposes of *Rooker-Feldman*.

Opinion Regarding Continuing Objections Filed By Debtor, Sandweiss, and Jahr to Claim of Kozlowski, *In re Bunting*, No. 07-20864 (Bankr. E.D. Mich. Sept. 29, 2011), ECF No. 974.

This divorce case has now spanned more than 12 years. The Debtor took five appeals to the Michigan Court of Appeals. And, when it seemed that he had exhausted his litigation resources, he found a willing proxy to attempt to continue to express his dissatisfaction with the amount awarded to his former spouse. The bankruptcy court properly declined to perpetuate this attempt. Its decisions should be affirmed.

## IV

Accordingly, it is **ORDERED** that the decisions of the bankruptcy court are **AFFIRMED**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: January 15, 2013

---

### PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on January 15, 2013.

s/Tracy A. Jacobs
TRACY A. JACOBS

---